## UNITED STATES v. ESTEP.
### No. 8810.

Circuit Court of Appeals, Third Circuit.

Argued Feb. 8, 1945.

Reargued before Court en Banc May 31, 1945.
Decided July 6, 1945.

Writ of Certiorari Granted Oct. 8, 1945.

See 66 S.Ct. 52.

Hayden C. Covington, of Brooklyn, N. Y., for appellant.

George Mashank, Asst. U. S. Atty., of Sharon, Pa., and Irving Shapiro, of Washington, D. C. (Charles F. Uhl, U. S. Atty., of Pittsburgh, Pa., on the brief), for appellee.

Before PARKER, BIGGS, MARIS, GOODRICH, and McLAUGHLIN, Circuit Judges, and LEAHY, District Judge.

GOODRICH, Circuit Judge.

Defendant, Estep, one of Jehovah's Witnesses, was indicted for failure to obey an order of his local board directing him to appear and be inducted into the United States Navy, 50 U.S.C.A. Appendix, § 311, and was found guilty. Estep had appeared at the induction center, after having been examined and found acceptable, and was told to "take one step forward"[1] constituting his induction into the Navy. He refused, giving the officer in charge a letter in which he asserted that as "a regular or duly ordained minister of religion" he was entitled to exemption from training and service by reason of Section 5(d) of the Selective Training and Service Act of 1940 as amended, 50 U.S.C.A. Appendix, § 305 (d).

The facts are as follows. On June 30, 1942, Estep registered. Subsequently he filed his questionnaire in which he claimed to be a minister and entitled to IV-D status. The local board unanimously classified him I-A; he appeared before the board claiming IV-D classification. This was refused; and on October 27, 1942, he filed notice of appeal. Shortly thereafter, he attempted to file three affidavits corroborative of his activities as a minister of religion which the chief clerk refused, a refusal which the defendant asserts violated Section 615.43 of Selective Service regulations.[2]

On cross-examination at the trial, the United States Attorney objected to the attempt by Estep's counsel to determine whether the clerk had lied as to the whereabouts of Estep's file; he was sustained. It is claimed this was error if for no other reason than that the credibility of the witness was involved in the question, but retrial on this ground alone was waived. The file or Cover Sheet was actually lost and apparently not found until early in 1944.

On February 22, 1944, Estep wrote to the local board stating that so far as he knew his case was being considered by the appeal board and that he did not wish to add to his file as it contained full explanation of his position. On April 19, 1944, Estep was directed to report for pre-induction physical examination; he was found fit for service and acceptable by the Navy. On May 23, 1944, Estep wrote to the local board stating he had examined his file and found certain documents missing; he inclosed eleven affidavits;[3] and he requested reconsideration of his I-A classification.[4] Of all the documents in his file these alone were not stamped; the chief clerk testified they were in the file but "not a part of his file." On July 28, 1944, Estep's file was forwarded to the appeal board. Accompanying it was a letter by the assistant clerk of the local board asserted to be violative of Section 627.13(b) of the Regulations.[5] On August 2, 1944, the appeal board unanimously classified Estep I-A and ordered him to report for induction on September 11, 1944. The events transpiring at the induction center have already been set out.

Estep asserts denial of due process of law by those charged with administering the Selective Training and Service Act.

[1] Directive of the Bureau of Navy Personnel, June 2, 1944, Circular Letter No. 11-44, provides for this method of induction.

[2] Selective Service Regulations, Section 615.43, provide in part: "Every paper pertaining to the registrant except his Registration Card * * * shall be filed in his Cover Sheet * * *."

[3] This letter and accompanying documents are marked "Deft's Ex. 'A', 12/7/44 H. T.", but were not admitted in evidence despite this designation. However, the brief of the United States refers to these documents as though in evidence and in fact sent to appeal board by local board.

[4] Selective Service Regulations, Section 626.2, provide in part: "The local board may reopen and consider anew the classification of a registrant * * * upon the written request of the registrant * * *, if such request is accompanied by written information presenting facts not considered when the registrant was classified which, if true, would justify a change in the registrant's classification * * *"

[5] Selective Service Regulations, Section 627.13(b) provide in part: "In preparing * * * a summary [of the written information in registrant's file], the local board should be careful to avoid the expression of any opinion concerning information in the registrant's file and should refrain from including any argument in support of its decision."

He contends that the local board's "Order to Report for Induction" was without legal sanction; that he had exhausted the Selective Service process; and that he was entitled to raise these matters as a defense in his trial on the criminal indictment for violation of the Selective Service Act.

In one of the earlier decisions applying the Selective Service Act, this Court said in United States v. Grieme, 3 Cir., 1942, 128 F.2d 811, 815: "We think it is clear that, if a local draft board acts in an arbitrary and capricious manner or denies a registrant a full and fair hearing, the latter, although bound to comply with the board's order, may, by writ of habeas corpus, obtain a judicial determination as to the propriety of the board's conduct and the character of the hearing which it afforded. The registrant may not, however, disobey the board's orders and then defend his dereliction by collaterally attacking the board's administrative acts." See also Ex parte Stanziale, 3 Cir., 1943, 138 F.2d 312, certiorari denied Stanziale v. Paulin, 320 U.S. 797, 64 S.Ct. 267, 88 L.Ed. 481 and United States v. Pitt, 3 Cir., 1944, 144 F.2d 169. The Fourth Circuit took a somewhat different view in Goff v. United States, 4 Cir., 1943, 135 F.2d 610. In Falbo v. United States, 1944, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305, the Supreme Court referred to the conflict and adopted the view stated in the Grieme case, supra. Even before the Falbo decision, supra, the same principle had been recognized. In the concurring opinion in Hirabayashi v. United States, 1943, 320 U.S. 81, 63 S.Ct. 1375, 1389, 87 L.Ed. 1774, Mr. Justice Douglas regarded it as settled law, and cited the Grieme case, supra, among others, as an instance in the law where "one must obey an order before he can attack as erroneous the classification in which he has been placed." And in the Falbo case, the Supreme Court held that Congress has not "authorized judicial review of the propriety of a board's classification in a criminal prosecution for wilful violation of an order directing a registrant to report for the last step in the selective process * * *." [320 U.S. 549, 64 S.Ct. 349].

Defendant accepts the Falbo decision, as of course he must. But he contends that the "last step in the selective process" is acceptance by the military forces after preinduction examination, and appearance at local board and induction center, rather than actual induction into service. For this he relies heavily on the decision in Billings v. Truesdell, 1944, 321 U.S. 542, 64 S.Ct. 737, 88 L.Ed. 917 which followed less than four months after the Falbo decision. The holding in the Billings case was that a man is not subject to military law or discipline until inducted and he is not inducted when accepted by the military but only when he has undergone the formal induction ceremony. The distinction thus made between acceptance and induction serves defendant as a basis for his contention that acceptance completes the administrative process, and that thereafter judicial review of classification can be called for.

In deciding when the administrative process is completed, it is relevant to keep in mind what all the activity is for. It is not ceremonial ritual, nor was it designed to provide committee activity for citizens of the various communities. It was, and is, designed to provide an Army and a Navy in a time of national emergency. The language of Congress, of the Supreme Court, and of those responsible for the administration of the selective service system, all make this clear.

In the first words of the Act, itself, Congress declared it "imperative to increase and train the personnel of the armed forces of the United States." 50 U.S.C.A. Appendix, § 301(a). The Supreme Court, taking note of Congressional intent in the Falbo case, emphasized that the "Act was passed to mobilize national manpower with the speed which that necessity and understanding required."

Couple these statements with the fact that the Act contains no explicit provision for judicial review prior to induction and Congressional design becomes manifest. The needs of the country come before those of the individual. Public necessity outweighs temporary individual inconvenience, even, it may be admitted, imposes considerable individual hardship in some cases. We cannot force the recruiting of the armed forces to wait while a civilian litigates his own private claims. Until a man is actually inducted he remains a civilian and military need is unsatisfied. The Billings case, far from being of aid to defendant, only makes it clearer that civilian status remains unchanged until induction actually takes place. So far as achieving what Congress intended is concerned, it makes no difference whether a man refuses to register, or to fill out a questionnaire, to report to local board or induction

station, or refuses to be inducted. In any event, the end is not achieved while the man remains a civilian. Until he is inducted the administrative process has not been exhausted. Until it is, the registrant may not challenge validity of the local board's order in court.

The intent of the Act is further reflected in the Selective Service Regulations which provide in part that an order to report for induction carries with it the duty "to report for induction"[6] and "to submit to induction."[7] The order is clearly part of the administrative process which is not exhausted until the order is fully obeyed. Partial obedience is not exhaustive. We think the explicit language of the Regulations is in accord with what seems to us, the clear Congressional purpose of the Act.

The Falbo case, supra, goes much further than establishing a mere procedural requirement. The principle laid down, as already noted, is based on Congressional intent concerning necessity of uninterrupted speed in fulfilling the local board's orders, for complete achievement of national defense. As was pointed out in Smith v. United States, 4 Cir., 1945, 148 F.2d 288, 292: "Among the advantages in cases such as this of limiting the remedy of the draftee to habeas corpus proceedings commenced after the administrative process has been completed, is that * * * questions which are primarily constitutional in character are heard before a judge without the distractions and uncertainties likely to accompany a criminal jury trial. Constitutional rights of citizens must, of course, be preserved in war as well as in peace; but the procedure outlined in the Falbo and Billings cases enables the courts to preserve them without unduly interfering with the war effort."

Still another consideration has been presented by Connor and Clarke, Judicial Investigation of Selective Service Action, (1945) 19 Tulane Law Review 344: "* * * a criminal proceeding presents an inappropriate forum for testing selective service action. This is evident because if the alleged improper or illegal action were not established as a defense nothing remains for the court to do but to fine or imprison the defendant, and the latter penalty is usually imposed. In any case the armed forces have lost a unit of manpower, whereas if the hearing is on a petition for the writ of habeas corpus the petitioner would in such a case be returned immediately to military control to begin his training. On the other hand, if the allegations of the defendant in the criminal proceedings were sufficiently convincing to justify acquittal he is discharged, but the same result obtains when the hearing is on the writ of habeas corpus."

After the Falbo and Billings cases, supra, a number of cases arose in the various circuits. One case, Tung v. United States, 1 Cir., 1944, 142 F.2d 919, 922 must be distinguished for there the defendant, "had not somewhere along the line by choice abandoned the administrative remedies given him by the Act, but instead was attempting to pursue them [by means of appeal]." There followed a series of cases where the registrant had not gone quite as far toward completion of the administrative process as in the instant case. Defendant either did not report to induction station or to the local board. See for example: Giese v. United States, 1944, 79 U.S.App.D.C. 126, 143 F.2d 633, affirmed, Per Curiam, 323 U.S. 682, 65 S.Ct. 437; Enge v. Clark, 9 Cir., 1944, 144 F.2d 638; Bagley v. United States, 9 Cir., 1944, 144 F.2d 788; United States v. Madole, 2 Cir., 1944, 145 F.2d 466; Biron v. Collins, 5 Cir., 1944, 145 F.2d 759; Goodrich v. United States, 5 Cir., 1944, 146 F.2d 265; Tatum v. United States, 9 Cir., 1944, 146 F.2d 406; Shigeru Fujii v. United States, 10 Cir., 1945, 148 F.2d 298; Klopp v. United States, 6 Cir., 1945, 148 F.2d 659. In still another case, Harris v. Ross, 5 Cir., 1944, 146 F.2d 355, habeas corpus was properly brought after induction to test lack of due process. In all of these cases the ratio decidendi was that of the Falbo case, as we have interpreted it.

Two decisions present facts squarely in point with the instant case. United States v. Flakowicz, 2 Cir., 1945, 146 F.2d 874, certiorari denied 65 S.Ct. 1086, and United States v. Rinko, 7 Cir., 1945, 147 F.2d 1, 2, certiorari denied 65 S.Ct. 1086. In each instance defendant was found "acceptable" after reporting for examination but refused to submit to induction. In the Rinko case, supra, the attempt to characterize the Billings case as a limitation of the Falbo doctrine failed, because the court thought "it is unreasonable to suppose that the court intended thereby within less than 90 days

---

[6] Selective Service Regulations, Section 633.21 (a).

[7] Selective Service Regulations, Section 633.21 (b).

following the Falbo decision to announce any different procedure than that approved in the Falbo decision—at least not by implication."

In Smith v. United States, 4 Cir., 1945, 148 F.2d 288, another issue was involved in the case and in part determined its conclusions. The general rationale, however, flowed clearly from the Falbo doctrine so far as it could be applied to the facts of that case. Specifically the Smith case stated, "the administrative process is not exhausted until the order of the board is complied with, which, as we have seen, embraces submitting to induction."

■■■ Our conclusion does not make a trap of the Falbo case. While defendant must report to the military in order to exhaust his administrative remedies, this does not mean that he can be forcibly inducted; nor does it mean that his induction is an exercise of free will and untrammeled choice. It simply means that when defendant submits to induction to exhaust administrative procedure he does so, under protest of the military's rights to hold him, as a duty of cooperation in effective law enforcement. Such submission is far different from either voluntary induction or forcible induction. Admittedly, under the Billings decision, forcible induction is no induction at all. And admittedly, where there is a voluntary submission to the authorities, habeas corpus cannot be brought because there can be no deprivation of freedom through a voluntary act.[8] But to submit under a command of law good at face value is not voluntary submission such as will bar judicial review. The law knows a number of situations, even in peacetime, where submission is regarded, as it should be here, as a duty of cooperation in effective law enforcement rather than as a voluntary submission such as will bar judicial review. "Thus, it is his duty to submit to arrest, upon a warrant valid on its face, even though the warrant may turn out later to be invalid. A citizen who resists arrest under such circumstances may subject himself to punishment for so doing, in spite of his complete innocence of the original accusation upon which the warrant was issued. So, also, one who is held upon a commitment, valid on its face, may be guilty of escape if he forces his way out of cus-

tody, even though the commitment, when properly challenged, may prove to be insufficient. Again, one who is a fugitive from a State in which he is unjustly accused of crime may, nevertheless, be subjected to extradition if the indictment and requisition are in proper form. And he may become guilty of a crime, under the federal law, merely by fleeing to another State to escape prosecution." Giese v. United States, 1944, 79 U.S.App.D.C. 126, 143 F.2d 633, 635, affirmed, Per Curiam, 323 U.S. 682, 65 S.Ct. 437. The court, in the opinion from which this quotation is made, further points out, the order to report is comparable legal process valid on its face.

■■■ There is no need to confine ourselves to the broad principles derived from analogy alone however. There are sufficient decisions under the Selective Training and Service Act to make it clear that a man may submit to induction without losing his right to review by habeas corpus. It should be stated, in frankness, that the point has been assumed, rather than discussed by the courts. That fact, we believe, does not weaken the force of the decisions in showing the judicial attitude on the point. Harris v. Ross, 5 Cir., 1945, 146 F.2d 355; Smith v. United States, 4 Cir., 1945, 148 F.2d 288; United States ex rel. Reel v. Badt, 2 Cir., 1944, 141 F.2d 845; United States ex rel. Brandon v. Downer, 2 Cir., 1944, 139 F.2d 761; United States ex rel. Phillips v. Downer, 2 Cir., 1943, 135 F.2d 521; Bagley v. United States, 9 Cir., 1944, 144 F.2d 788 (dictum); United States v. Bowles, 3 Cir., 1944, 131 F.2d 818 (dictum); affirmed 319 U.S. 33, 63 S.Ct. 912, 87 L.Ed. 1194; Drumheller v. Berks County Local Board No. 1, 3 Cir., 1942, 130 F.2d 610 (dictum); Rase v. United States, 6 Cir., 1942, 129 F.2d 204 (dictum). In the District Courts the principle has been recognized even more often than in the Circuit Courts. Ex Parte Stewart, D.C.Cal., 1942, 47 F. Supp. 410; United States ex rel. Bayly v. Reckord, D.C.Md., 1943, 51 F.Supp. 507; United States ex rel. Altieri v. Flint, D.C. Conn., 1943, 54 F.Supp. 889, affirmed 2 Cir., 142 F.2d 62; Micheli v. Paullin, D.C.N.J. 1943, 45 F.Supp. 687; United States ex rel. Mauro v. Downer, D.C.N.Y., 1943, 50 F. Supp. 412; In re Rogers, D.C.Tex., 1942, 47 F.Supp. 265. Both as a matter of broad

---

[8] See Baker v. Grice, 1897, 169 U.S. 284, 18 S.Ct. 323, 42 L.Ed. 748; Ex parte Simon, 1939, 208 U.S. 144, 28 S.Ct. 238, 52 L.Ed. 429; United States v. Peckham,

D.C., 143 F. 625; Ex parte Ford, 160 Cal. 334, 116 P. 757, 35 L.R.A.,N.S., 882, Ann. Cas.1912D, 1267.

principle and actual application habeas corpus is firmly rooted in the law as a post-induction remedy that is not defeated by the fact of obedience to orders by the inductee.

The judgment of the District Court is affirmed.

BIGGS, Circuit Judge (dissenting).

The defendant, Estep, contends that he was denied due process of law by the Selective Service agencies and that the trial court also denied him his constitutional rights by ruling that he might not interpose the asserted invalidity of the order requiring him to report for induction as a defense to his indictment. I conclude for the reasons hereinafter stated that Estep was denied due process of law by the Selective Service agencies, that the order requiring him to report for induction was invalid and that the trial court erred in not permitting the defendant to assert this as a defense to his indictment. As I read the opinion of this court, the majority conclude that even if Estep was denied due process of law by the Selective Service agencies he may not raise this issue as a defense at his trial but must submit to induction and then seek relief by way of application for a writ of habeas corpus.

I shall call attention to certain facts which I think require particular consideration since, in my opinion, they show that Estep was denied due process of law by the Selective Service agencies and by the court below in an erroneous interpretation of the existing law. Some of the circumstances appear from evidence received by the court below; others, from the offer of proof made by the defendant during the course of the trial. For the purposes of this appeal, the matter contained in the offer of proof must be deemed to be true. Substantially all of it is documentary and its probative force may not be seriously controverted. I shall treat the proof in evidence and that contained in the defendant's offer as if they were one except for occasional specific references.

Estep, a member of the sect of Jehovah's Witnesses, was found guilty on an indictment charging him with failure to obey an order of his local board directing him to appear and be inducted for training and service in the United States Navy. Estep appeared at the induction center and when his name was called so that he might "take one step forward"[1] to constitute his induction into the Navy, he refused to take that step. Estep gave a letter to the officer in charge, stating his reasons for refusing induction. In this letter he asserted that he was "a regular or duly ordained minister of religion" and entitled to exemption from training and service by reason of Section 5(d) of the Selective Training and Service Act of 1940 as amended, 50 U.S.C.A. Appendix, § 305(d). Estep's course was patterned on that of Billings. See Billings v. Truesdell, 321 U.S. 542, 64 S.Ct. 737, 88 L.Ed. 917. Compare the circumstances of United States v. Pitt, 3 Cir., 144 F.2d 169.

Estep registered on June 30, 1942. His questionnaire was received by the local board on August 22, 1942. He stated in his questionnaire that he was a minister and claimed a IV-D classification. On October 3, 1942, the local board by the unanimous action of its members classified him as I-A. On October 21, 1942, Estep appeared before the board and stated his reasons why he believed he was entitled to a IV-D classification. The following day the board informed Estep that after considering his case it refused to change his classification. On October 27, 1942, Estep wrote a letter to the board in which he stated, "I hereby file notice of appeal from classification 1-A to classification 4-D." At a date not clear from the record but shortly after the date last mentioned, Estep went to the office of the local board and endeavored to file three affidavits, executed respectively by C. R. Hessler, by Earl Ferree and by William G. Reese. Hessler, Ferree and Reese were members of the sect of Jehovah's Witnesses and the subject matter of their affidavits was corroborative of Estep's assertion that he was a regular minister of religion. Estep had filed with the local board a copy of his certificate of association with the Watchtower Bible and Tract Society. The affidavits of Hessler, Ferree and Reese, the copy of the certificate of association aside, constituted the only corroboration offered

---

[1] A directive from the Bureau of Navy Personnel under date of June 22, 1944, Circular Letter No. 11-44, provides that the registrants assigned to naval service must be informed of the imminence of induction and that the inducting officer will then state to them: "You are now about to be inducted into the United States Navy. You will take one step forward as your name is called and such step will constitute your induction into the United States Navy."

by Estep of his asserted status as a minister of religion up to that time. The affidavits though included in the offer made by Estep's counsel at his trial, were not received in evidence.

The chief clerk of the local board refused to accept the affidavits, stating, according to Estep's testimony, that the board could not receive them because Estep's case was before the appeal board. On cross-examination at Estep's trial the chief clerk was asked the reason for his refusal to receive the affidavits. He replied that Estep had no right to file the affidavits since his case had come before the local board and had been "considered." He was then asked by Estep's attorney, "Mr. Clerk, you told him that his file was before the appeal board?" He replied, "I might have told him that, yes." He was asked, "Then you told him a lie?" He answered, "Possibly." Estep's counsel then inquired, "Why did you tell him a lie?" The question was not answered for an objection interposed by the United States Attorney was sustained. Actually, at the time Estep offered the affidavits to the chief clerk, his cover sheet or file was lost. The file or cover sheet was not sent to the appeal board until 1944. Despite the fact that it was lost an anonymous communication with a newspaper clipping attached, received by the local board in an envelope postmarked December 2, 1942, found its way into the cover sheet. When this anonymous communication was offered in evidence by Estep's counsel, apparently as proof of irregularity of the proceedings before the board, it was refused admission. The clerk of the local board also testified that Estep's file "came to light at the time * * * [Estep's] brother's case was before the Federal Court." This date is not in the record but the file or cover sheet apparently was found by the local board early in 1944.

On February 22, 1944, Estep wrote a letter to the local board in which he stated in part: "So far as I know my case is being considered by the Board of Appeal. I do not wish to add anything further to my file at this time as the information it now contains fully explains my position as a minister and sets forth my request for a minister's classification; that is, a IV-D classification."

On April 19, 1944 Estep was directed to report for a preinduction physical examination and was found fit for service and acceptable by the United States Navy. On May 23, 1944 Estep wrote a letter to the local board in which he stated that he had gone over his file in the office of the local board and "* * * found that certain statements which had been attached to my questionnaire; ministerial certificate from the Watchtower Bible & Tract Society * * *; copy of 'Consolation' magazine * * * [and certain other documents] are all missing from my file. I have prepared copies of these letters and statements and attach them hereto." Estep also said in the letter: "I believe that Local Board No. 4 has not given sufficient consideration to my case, and I request that they again reconsider it and give me my proper classification as a regular and duly ordained minister, namely, IV-D. In October 1942 I presented to the Local Board for filing in my file a sworn statement dated October 17, 1942, and affidavits from C. R. Hessler, Earl ·Ferree, and William G. Reese. At that time I was advised that my file had been sent to the Appeal Board and that these papers could not be added to the file. Apparently the file has not been sent to the Appeal Board as yet, and I enclose these affidavits and request that the Local Board consider them and add them to my file." Enclosed with the letter were eleven affidavits (those of Hessler, Ferree and Reese hereinbefore referred to and eight additional affidavits also corroborative of Estep's asserted status, all rejected by the trial court) and certain other documents which need not be described here. The chief clerk of the local board testified that Estep's letter of May 23, 1944 was in Estep's file "but is not part of his file." Neither the letter nor any of its accompanying documents is stamped with the stamp of the local board.

On July 28, 1944 Estep's file was forwarded to the appeal board.[2] It was accompanied by a letter written by an assistant clerk of the local board to the appeal board. The letter was received in evidence. It states in part, "Mr. Estep is not listed as a minister in any list yet submitted from National Headquarters of Selective Service. Although this registrant is not gainfully employed and devotes his time to the ministry, he does not contribute enough

---

[2] The reason for the additional delay in forwarding Estep's appeal to the appeal board does not appear from the record.

The lost file or cover sheet had been found prior to April 19, 1944.

hours to this work to be considered a full-time minister since he works only three days a week in that capacity and is not justified to a 4-D classification." The minutes of Estep's hearing of October 21, 1942 before the local board supply the only evidence from which the board could infer that he devoted only three days a week to his work as a member of the sect of Jehovah's Witnesses. This evidence is slight, amounting to little more than a scintilla. A transcript of the minutes of Estep's hearing before the local board, though offered in evidence by Estep, was rejected by the trial court.

On August 2, 1944 the appeal board by unanimous action classified Estep as I-A.[3] He was ordered to report for induction on September 11, 1944.

Estep asserts as has been stated that he was denied due process of law by the tribunals and persons charged with administering the Selective Training and Service Act; because in particular, his local board and those acting for it or pursuant to its authority did not adhere to the regulations promulgated under Section 10 of the Act, 50 U.S.C.A. Appendix, § 310. He contends in effect that the corroborative material offered by him was not received by the local board and was not considered by the appeal board; that if it had been considered these tribunals would have concluded that he was a regular minister of religion and entitled to exemption from training and service. He asserts also that the letter of July 28, 1944, written on behalf of his local board to the appeal board prejudiced his case with the appeal board. For these rea-sons he contends that the order of the local board directing him to appear for induction was without legal sanction; and that, having exhausted the Selective Service process, he was entitled to raise these matters at his trial as a defense to the indictment. Before proceeding to a discussion of the principles of law embodied in the decisions of the Supreme Court in Billings v. Truesdell, supra, in Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305, and decisions of lower federal courts in other cases, it is necessary to refer to pertinent Selective Service Regulations and their application to the facts as stated.

Estep offered the first substantial corroboration of his activities as an asserted minister of religion of the sect of Jehovah's Witnesses to the chief clerk of the local Board, albeit after he had appealed, at the end of October or the beginning of November, 1942. This material included the affidavits of Hessler, Ferree and Reese. The clerk refused to receive these affidavits on a ground unfounded in fact. Section 615.43 of the Selective Service Regulations provides in part: "Every paper pertaining to the registrant except his Registration Card * * * shall be filed in his Cover Sheet * * *." Estep testified that he offered the affidavits in order that they might be sent by his local board to the appeal board to be considered by the latter in disposing of his case. He did not, as he now asserts, seek at that time to have his classification reopened by the local board. Had he been aware of the fact that his cover sheet had not gone to the appeal board, he would have

---

[3] On August 10, 1944 a letter was written by the legal adviser for the State Director of Selective Service to the chairman of the local board, which stated, "We are returning the cover sheet of the above registrant [Estep]. On August 2, 1944, the board of appeal affirmed your I-A classification of October 3, 1942. * * * We would appreciate being advised as to the reasons for delay in acting on this case and your returning the cover sheet to us with your letter of explanation. When you return the cover sheet, please obtain from the registrant a statement as to his precise activities as a Jehovah's Witness at this time, including the amount of time he now devotes, and his official title in that organization." On August 22 a clerk of the local board enclosed Estep's "complete file" and wrote that "The delay in acting on this case was through an oversight on the office force." The letter also states that a statement was obtained from Estep as to his activities as a Jehovah's Witness as of the date of the letter. This statement is not in evidence and is not included in any part of Estep's file or cover sheet with the local board, presently before us. On August 25 a letter was written by the Deputy State Director to the local board stating that " * * * it is apparent that there has been considerable irregularity in the handling of this case, and we are disturbed by the inadequacy of the explanation offered. * * *" The letter went on to say, "We are now particularly concerned in having the file perfected and in having the case further processed in accordance with the obvious requirements, in that you complete the 'Local Board' action on receiving decision of Board of Appeal * * * and proceed to order the registrant for induction * * *."

been entitled to insist that the affidavits be received by the local board and his case given further consideration.

In view of the fact that Estep's cover sheet or file had not gone forward to the appeal board, the local board should have received the affidavits and put them in the cover sheet as required by Section 615.43 of the Regulations. Perhaps, the chief clerk of the local board without warrant in fact permitted Estep's counsel at the trial to attribute to him a base motive when he agreed that "Possibly" he might have lied to Estep. The clerk may have meant nothing more than that he was mistaken in telling the registrant that his file had gone to the appeal board. Inquiry into the clerk's motives was terminated by the objection interposed by the United States Attorney. The learned District Judge erred in sustaining this objection if for no other reason than because the question would have thrown light upon the credibility of the witness. At the reargument of this cause before the court en banc Estep's counsel stated that he waived this ground for a new trial. He made plain, however, that he did not retreat from his position that the misinformation given by the chief clerk of the local board to Estep as to the status of the latter's file was a denial of due process of law.

It may be pointed out that Estep on February 22, 1944, knowing that the proffered corroborative material had been rejected in 1942, wrote to the local board and stated that he did not wish to add anything further to his file. It could be contended that by this admission Estep showed himself to be content with the rejection of the affidavits of Hessler, Ferree and Reese, that he was satisfied with his file as then constituted and that therefore any breach by the local board of Section 615.43 became immaterial. But statements made by a registrant should not be treated as an exercise in polemics to end that he may be trapped by his own lack of logic. Since the chief clerk of Estep's local board either lied to him or materially misstated facts with the

effect that the registrant concluded that this corroborative material could not be received and therefore could not be considered either by the local board or the appeal board, I think it is necessary to conclude that Estep in this regard was not afforded due process of law by the local board.

Whatever may have been Estep's attitude in respect to the rejection of the proffered corroborative material in 1942, in his letter of May 23, 1944 Estep stated to the local board that he had examined his file and had found certain documents to be missing. He enclosed with his letter[4] eleven affidavits designed to corroborate his assertion that he was a minister of religion. These included the affidavits of Hessler, Ferree and Reese and eight additional affidavits. Estep also stated in his letter that he believed that the local board had not given sufficient consideration to his case and requested reconsideration of his I-A classification.

Section 626.2 of the Regulations provides in part: "The local board may reopen and consider anew the classification of a registrant * * * upon the written request of the registrant * * *, if such request is accompanied by written information presenting facts not considered when the registrant was classified which, if true, would justify a change in the registrant's classification * * *." The material enclosed by Estep with his letter of May 23 to the local board was corroborative though it also presented facts which were not considered by the local board when it made its original classification. The affidavit of Oliver G. Cuppett, asserting that Estep was the "company servant for the Uniontown company" of Jehovah's Witnesses, will serve as an example. Of course it may not be said that a consideration of this material necessarily would have required a change in Estep's classification. It might or might not have worked this result but the question was one for the local board to decide upon receipt of Estep's request for reclassification and an examination of the material submitted by him.

It seems probable that the local board

4 Estep's letter of May 23, 1944 and the accompanying documents are marked "Deft's Ex. 'A,' 12/7/44 H. T.," but they were not admitted in evidence despite this designation by the clerk or stenographer of the District Court. Nonetheless the United States Attorney refers to these documents as if they were in evidence and had in fact been sent to the appeal board

by the local board. The brief of the United States states, "On May 22, 1944 he [Estep] sent, by registered mail, additional evidence to his Local Board with a request that same be placed in his file and forwarded to his Appeal Board. On July 28, 1944, his file was forwarded to the Appeal Board."

did not receive the affidavits as a part of Estep's file or consider his request. As has been stated, the chief clerk of the local board testified that though the letter of May 23 and the affidavits were in Estep's file they were "not a part of his file", and it is notable that of all the papers contained in Estep's cover sheet these documents alone were not stamped with the stamp of the local board. Section 626.3 of the Regulations provides in pertinent part: "When a registrant * * * files with a local board a written request to reopen and consider anew the registrant's classification and the local board is of the opinion that the information accompanying such request fails to present any facts in addition to those considered when the registrant was classified * * *, it shall not reopen the registrant's classification. In such a case the local board, by letter, should advise the person filing the request that the information submitted does not warrant the reopening of the registrant's classification and should place a copy of the letter in the registrant's file." The local board wrote no letter to Estep as required by the Regulation last quoted. From all these facts the inference could be drawn that the local board did not consider Estep's request or pass upon the corroborative material sent to it by him. Consideration of Estep's request for reclassification and examination of the material offered by him was a duty imposed upon the local board by the Act and the Regulations. Inquiry into the question of whether or not the local board considered Estep's request and examined the corroborative material was prohibited by the ruling of the court below. If the local board did not consider Estep's request for reclassification or examine the corroborative material offered by him, in my opinion under the circumstances, it denied him due process of law. It should be pointed out that the registrant undoubtedly assumed, as he had the right to do, that his request for reclassification and the eleven affidavits had been included in his cover sheet. It is clear that in this instance Estep was not informed by the local board that this material was not to be included in his cover sheet.

The chief clerk of the local board stated categorically that the material referred to was not forwarded to the appeal board. It follows therefore that the appeal board's de novo consideration of Estep's case could not cure a denial to him of due process of law by the local board.

One final question relating to the Regulations remains for discussion. Section 627.-13(b) provides in part, "In preparing * * * a summary [of the written information in the registrant's file], the local board should be careful to avoid the expression of any opinion concerning information in the registrant's file and should refrain from including any argument in support of its decision." The letter of July 28 written by the assistant clerk of the local board to the appeal board, quoted in material part at an earlier point in this opinion, violated this section. The letter was argumentative and contained expressions of opinion as to the information in the registrant's file. The regulation states that the local board "should be" careful to avoid the expression of opinion and "should refrain" from including any argument in support of its own decision and that other portions of Section 627.13 and the Regulations generally use the auxiliary verb "shall". But the auxiliary verb "should" should not be considered as merely precatory.[5] It was the intent of the framers of the Regulations by Section 627.13(b) to make certain that an appeal board in considering the classifications of a registrant would embark upon that consideration unaffected by any observation, opinion, or argument of a local board. The Selective Service Regulations were intended to have and do have the effect of law. See Smith v. Richart, D.C. E.D.S.C., 53 F.Supp. 582; United States ex rel. Bayly v. Reckford, D.C.D.Md., 51 F. Supp. 507, 510-513; United States v. Downer, 2 Cir., 143 F.2d 125. For analogy see United States v. Eliason Administratrix, 16 Pet. 291, 302, 10 L.Ed. 968; Nordmann v. Woodring, D.C., 28 F.Supp. 573, 576. Cf. Standard Scale Co. v. Farrell, 249 U.S. 571, 577, 39 S.Ct. 380, 63 L.Ed. 780.

It may be argued that Estep has not shown that his cause was prejudiced before the appeal board by the letter of July 28. Such an argument is not entitled to weight. The selectee at his trial should not be permitted to bring the members of an appeal board before the court to show the basis of their classification of him. The President, authorized by Section 10 of the Selective Training and Service Act to prescribe the necessary rules and regulations to carry out the provisions of the Act, delegated this

---

[5] Webster's New International Dictionary states, "Should is everywhere used in the same connection and the same senses as shall, as its imperfect."

duty to the Director of Selective Service who promulgated the Selective Service Regulations. See Executive Order No. 9410, of December 23, 1943, 50 U.S.C.A. Appendix, § 310 note, 8 F.R. 17,319. The agency charged with the administration of the Act promulgated the regulation with which we are presently concerned. From its terms, the conclusion is irresistible that the Director determined that the expression of opinion or argument in support of its decision by a local board to an appeal board might prove prejudicial to a registrant. We should not look behind this ruling. I conclude therefore that the action of the clerk of the local board in sending the letter of July 28 to the appeal board for consideration of its contents constituted a denial of due process of law to Estep.

Having reached these conclusions, it is necessary to find and apply the correct principles of law to the facts of the case at bar. This requires a discussion of the two leading decisions of the Supreme Court; viz., Falbo v. United States and Billings v. Truesdell, supra. It will be noted that after the date of the Billings decision the Selective Service process was changed so that registrants were given physical examinations prior to being ordered to report for induction. See the Act of December 5, 1943, 50 U.S.C.A. Appendix, § 304a. Estep, as we have stated, was given a physical examination and was found to be acceptable by the Navy. Following the Supreme Court's decision in the Billings case, and perhaps because of it, the process of actual induction was altered so that selectees reporting at the induction center were required to take "one step forward" when invited to do so by the officer in charge, the "one step forward" constituting a selectee's actual induction into the Army or Navy. See note 1, supra. The Billings case holds that the selectee is not "actually inducted" within the meaning of Section 11 of the Act, 50 U.S.C.A. Appendix, § 311, until he undergoes whatever "ceremony or requirements of admission" have been prescribed; that until "actually inducted" the selectee is subject solely to civil jurisdiction and therefore may not be tried by court martial. It follows that if the selectee refuses to take "one step forward" when directed to do so by the officer in charge of induction, that refusal would constitute a violation of the order of his local board to report for induction and, if that order is valid, the selectee will incur the penalties prescribed by Section 11 of the Act, 50 U.S.C.A. Appendix, § 311. In the Billings case Mr. Justice Douglas stated, 321 U.S. at pages 558, 559, 64 S.Ct. at page 746, 88 L.Ed. 917: "* * * it should be remembered that he who reports at the induction station is following the procedure outlined in the Falbo case for the exhaustion of his administrative remedies. Unless he follows that procedure he may not challenge the legality of his classification in the courts. But we can hardly say that he must report to the military in order to exhaust his administrative remedies and then say that if he does so report he may be forcibly inducted against his will. That would indeed make a trap of the Falbo case by subjecting those who reported for completion of the Selective Service process to more severe penalties than those who stayed away in defiance of the board's order to report. These considerations together indicate to us that a selectee becomes 'actually inducted' within the meaning of § 11 of the Act when in obedience to the order of his board and after the Army has found him acceptable for service he undergoes whatever ceremony or requirements of admission the War Department has prescribed."

In the Falbo decision, 320 U.S. at pages 554, 555, 64 S.Ct. at page 349, 88 L.Ed. 305, Mr. Justice Black stated that Congress was not required to provide "* * * for judicial intervention before final acceptance of an individual for national service." He went on to say: "The narrow question therefore presented by this case is whether Congress has authorized judicial review of the propriety of a board's classification in a criminal prosecution for wilful violation of an order directing a registrant to report for the last step in the selective process. We think it has not. The Act nowhere explicitly provides for such review and we have found nothing in its legislative history which indicates an intention to afford it. The circumstances under which the Act was adopted lend no support to a view which would allow litigious interruption of the process of selection which Congress created. * * * Surely if Congress had intended to authorize interference with that process by intermediate challenges of orders to report, it would have said so."

Reading the Falbo decision in the light of Billings v. Truesdell, I think that the Supreme Court construed the Act to afford no judicial intervention to disrupt the Selective Service process but did not interpret

its provisions to mean that there should be no judicial review of the Selective Service process when it had been completed. If it were otherwise how could the Falbo case serve as a "trap" to subject those who reported for completion of the Selective Service process to more severe penalties than those who stayed away from the induction center in defiance of a board's order to report? The reference to a difference in possible penalties made by Mr. Justice Douglas is not an allusion to penalties which might be imposed by court martial as distinguished from those which might be imposed by civil tribunals for if the selectee refuses to report he remains subject to civil justice. I conclude therefore that Mr. Justice Douglas referred to the imposition of a penalty for failure to report for induction as distinguished from one imposed for refusal to be inducted after an order of a local board requiring the selectee to report for induction. In the Falbo case Mr. Justice Black laid emphasis upon the necessity of not interrupting the Selective Service process, stating that there must be no litigious interruption of the process of selection which Congress had created; no intermediate challenge of orders to report.

But in the case at bar Estep exhausted the administrative procedures.[6] The Selective Service process was completed up to the final "one step forward" that a selectee must take to constitute his induction into the Armed Forces. At this point determination of the issue of whether or not a selectee had been awarded due process of law by the Selective Service agencies would not, in my opinion, constitute litigious interruption of the process of selection or an intermediate challenge to an order to report for induction. The question is not free from doubt, but as I read the Falbo and Billings decisions there may be judicial intervention to determine whether the selectee has been afforded due process if he be indicted for his refusal to be inducted. The Selective Service process having been completed to this point, if judicial intervention is ever permissible to protect a constitutional right it is here. If judicial intervention may not be availed of by the selectee at this juncture, it will never be available for the "one step" which the registrant must take to constitute his induction is a "voluntary" one. The word "voluntary" is used for want of a more apt adjective.

While the one step forward is compulsory in the sense that the selectee is compelled to take it or become liable to the sanctions and penalties imposed by Section 11 of the Act, none the less the step forward is voluntary in that the selectee is under no physical compulsion to take it. He takes the step forward or does not take it as his will dictates. The statement of the inducting officer to the selectees, "You will take one step forward as your name is called and such step will constitute your induction * * *" cannot be deemed to be a command for the selectee is not yet subject to martial authority. See the language of the Billings opinion quoted above. The words of the inducting officer therefore are nothing more than a request to the selectee that he take one step forward to constitute his induction.

If the selectee takes the step he subjects himself to the jurisdiction of the naval or military authorities and thereafter cannot avail himself of the writ of habeas corpus to test the question of whether the Selective Service agencies have afforded him due process of law for by subjecting himself to induction the selectee has deprived himself of his right to claim that he is subject to unlawful restraint by the naval or military forces. See McNally v. Hill, 293 U.S. 131, at page 138, 55 S.Ct. 24, 27, 79 L.Ed. 238, where Mr. Justice Stone stated: "Without restraint of liberty, the writ will not issue. * * * Equally, without restraint which is unlawful, the writ may not be used." If the selectee takes the one step forward he cannot thereafter assert that he did so under protest for, as we have shown, the inducting officer merely invites him to take the step. Compare United States v. Powell, D.C., 38 F.Supp. 183, 186. An analogy is presented by those cases in which the submission to custody was voluntary for the purpose of procuring the writ. See Baker v. Grice, 169 U.S. 284, 293, 294, 18 S.Ct. 323, 42 L.Ed. 748; Ex parte Simon, 208 U.S. 144, 28 S.Ct. 238, 52 L.Ed. 429; United States v. Peckham, D.C., 143 F. 625; Ex parte Ford, 160 Cal. 334, 116 P. 757, 35 L.R.A.,N.S., 882, Ann.Cas.1912D, 1267. See 39 C.J.S., Habeas Corpus, § 10, and the authorities therein cited and 25 Am.Jur., Habeas Corpus, § 25. Cf. Ex Parte Beach, D.C., 259 F. 956. It is the weight of authority that a writ of habeas corpus ad subjiciendum may not be award-

---

[6] It will be observed that Estep had no appeal to the President for the actions of both the local board and the appeal board were unanimous.

ed where the submission to restraint is voluntary. If the selectee who took the step forward thereafter refused to obey a lawful command of his superior officer and was held for court martial, it seems settled that he would not be entitled to be set at liberty by the writ. He would then be regularly in the custody of the military or naval authorities which would have jurisdiction to try him by military law for a military offense. Under such circumstances the civil courts could not intervene on his behalf. See United States v. MacDonald, D.C., 265 F. 695; Ex parte Dostal, D.C., 243 F. 664; Ex parte Beales, D.C., 252 F. 177; Ex parte Rock, C.C., Ohio, 171 F. 240; and In re Davison, C.C., N.Y., 21 F. 618.

It follows therefore that if the order of the local board directing the selectee to report for induction is invalid for any reason, unless the selectee can assert that invalidity as a defense to an indictment, he is indeed entrapped. Compare the decision of this court in United States v. Grieme, 3 Cir., 128 F.2d 811, and the very numerous decisions of like tenor. See for example United States v. Van den Berg, 7 Cir., 139 F.2d 654; United States v. Sauler, 7 Cir., 139 F.2d 173; and Harper v. United States, 5 Cir., 138 F.2d 538. Cf. United States v. Rinko, 7 Cir., 147 F.2d 1, and United States v. Flakowicz, 2 Cir., 146 F.2d 874. I conclude that if the Selective Service process has been completed by the Selective Service agencies and the only incident remaining is submission to induction by the selectee, the selectee, who has refused induction, is entitled to assert as a defense to his indictment under Section 11 of the Act a denial to him of due process of law. No distinction can be made between the validity of the punitive sanctions imposed by Section 11 of the Act when invoked solely by reason of the violation of an induction order and the validity of the induction order itself. The punitive sanctions may not be said to be unassailable even though the induction order, the violation of which is the sole basis for imposition of the sanctions, is a mere nullity. If the induction order is a nullity because it has been directed to a selectee after failure of the Selective Service agencies to afford him due process of law, the punitive sanctions of Section 11 may not be imposed validly. Cf. Ex parte Catanzaro, 3 Cir., 138 F.2d 100, 102, certiorari denied 321 U.S. 793, 64 S.Ct. 789, 88 L.Ed. 1083, and Ex parte Stanziale, 3 Cir., 138 F.2d 312, certiorari denied sub.

nom. Stanziale v. Paullin, 320 U.S. 797, 64 S.Ct. 267, 88 L.Ed. 481. To hold otherwise would be to deprive the registrant or selectee of his rights under the Selective Training and Service Act. Cf. United States v. Pitt, 3 Cir., 144 F.2d 169, 173. No matter how arbitrary, capricious or biased the action of the Selective Service agencies might be, no relief could be afforded the selectee.

I can see no reason for concluding that Congress did not intend to afford complete protection to the selectee within the framework of the Selective Training and Service Act. Section 11 provides for the trial by the civil authority of any person who violates the Act and who has not been "actually inducted." In the Billings case, as has already been pointed out, the Supreme Court made it clear that the selectee was not subject to the military or naval jurisdiction until he underwent whatever "ceremony or requirements of admission" have been prescribed. If the selectee who has not been inducted may not be tried by court martial and must be tried by the civil authority, how can he ever assert denial of due process of law to him unless he can raise it as a defense at his trial? The majority of this court insist that the inducted man may raise the defense on application for writ of habeas corpus. Assuming (as I think is not the case) that having voluntarily submitted himself to the naval or military authorities the writ would lie on the inducted man's behalf, the ruling of the majority none the less renders the pertinent provisions of Section 11 meaningless for the statute requires the trial of the alleged delinquent in a criminal proceeding in a district court of the United States. If the defendant in such a proceeding, having exhausted his administrative remedies, cannot question the validity of the order upon which the punitive sanction sought to be applied to him is based, why should Congress require him to be tried in a court where such a defense would be available? Moreover, if the selectee who has not submitted to the military or naval authority cannot raise the defense of denial of due process of law at his trial, he can never raise it.

What has been said does not mean that a selectee may retry his classification on his indictment before a district court of the United States, or that he may adduce evidence at his trial to prove that he is a regular or ordained minister of religion entitled to exemption pursuant to the provi-

sions of Section 5(d) of the Act. These courses are prohibited to him. Evidence as to his status, if he claims exemption, must be submitted to his local board. He may offer evidence at his trial as a defense to the indictment that the Selective Service agencies, the local board or the appeal board, arbitrarily or capriciously refused to receive or consider evidence which he endeavored to submit as to his status. He may show by the material within his cover sheet that the local board or the appeal board acted capriciously or arbitrarily in refusing to award him the status of an exempt registrant. He may produce evidence in court that material relevant to his status, timely offered by him, was rejected. He may show that members of the local board or the appeal board are biased, prejudiced or disqualified under the Selective Service Regulations to sit in his case. He may show any or all of these things at his trial as proof that he was denied due process of law by the Selective Service agencies. Beyond this, he may not go.

Whether the selectee has or has not been afforded due process of law by the Selective Service agencies is a question of law for the court and must be determined by it as a legal conclusion though disputed questions of fact of course must be determined by the jury under proper instructions. A pure question of law arose in the case at bar in respect to the letter of July 28, 1944, admittedly sent by the local board to the appeal board. For analogy see United States ex rel. Bayly v. Reckord, 51 F.Supp. 507 at page 510.[7] Because of the letter of July 28, 1944 the trial court should have directed a verdict in favor of the defendant. If it were not for what I deem to be the legal effect of the letter, I would conclude that this court should reverse the judgment and remand the cause for a·new trial in order that the other questions which I have referred to might be determined after submission of the rejected evidence. In view of the letter of July 28 it would be futile to order a new trial in the case at bar.

The judgment of conviction should be reversed. A reversal would not exempt defendant from prompt and proper action by the Selective Service agencies.

LEAHY, District Judge (concurring in the dissent).

I fully concur in the dissenting opinion of Judge Biggs that Estep was denied due process. Instead of reversing the judgment of conviction I think a new trial should be ordered.

Estep did not get an opportunity to prove at his trial that he had failed to get due process before the draft boards. It is novel doctrine that a constitutional right depends upon what procedural technic is selected for its protection or that Congress by enactment of the Selective Service Act or any other statute may regulate the protection of any one of the master rights given by the Constitution. Neither am I convinced the Supreme Court has made it law that Estep may only challenge invasion of his constitutional right of due process by submitting to an oath of induction and then applying for a writ of habeas corpus.

When indicted for crime, it is always permissible to bring a plea of constitutional infringement before the trial judge for his critical examination. If this is not so, then protection of constitutional rights must depend upon formalistic considerations of selection of the proper writ or forum where one may tell the story of denial of such rights. If one compelled to stand criminal trial is not to be permitted to be heard on the fact of absence of due process, then the right is illusory. If the Court's views are accepted, Estep has lost his right to demand due process by default because he lacked the ability to distinguish between Falbo v. United States and Billings v. Truesdell. It is my view that the trial judge should have made inquiry upon the proffer of proof to ascertain if Estep did or did not receive due process. This, he failed to do.

A new trial should be ordered.

---

[7] Judge Chesnut stated, "My conclusion of law is that the action of the Local Board in intentionally disregarding the applicable regulation and directive and thus including the petitioners in the July quota list was legally arbitrary and capricious; and the petitioners are entitled to be * * * released from custody."